533 N.W.2d 497 (1995)
In the Matter of the ESTATE OF Lou D. CARPENTER, Deceased.
Robert BECKMANN, Temporary Executor of the Estate of Lou D. Carpenter, Appellee,
v.
Jack DENSMORE, Frank Densmore, and Fritzi Densmore Vee, Appellants,
Lorna Densmore Funk, Fred A. Ellis, Frank Ellis, Thelma Ellis Riehm, Charles Ellis, Irene Ellis Byrne, Donald E. Bergman, James D. Corwin, Robert J. Devaney, Kevin P. Halterman, Kenneth W. Harder, James A. Maurice, Richard J. Moore, Louis L. Morf, Robert D. Patten, Gerald G. Retzlaff, Dean J. Ricklefs, D.P. Sutherland, and Monticello State Bank Profit Sharing Trust, Monticello State Bank, Prior Trustee, Appellees.
No. 93-1484.
Supreme Court of Iowa.
May 24, 1995.
As Amended on Denial of Rehearing June 15, 1995.
Robert N. Downer and Timothy J. Krumm of Meardon, Sueppel, Downer & Hayes, P.L.C., Iowa City, and Charles T. Beckman of Elmann, Gehlback, Beckman & Lee, Dixon, IL, for appellants.
Stephen E. Locher and Nick Strittmatter of Locher, Locher & Strittmatter, Monticello, for appellee Robert Beckmann.
Jon P. Sullivan and Miriam S. Sawtelle of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for all other appellees.
Considered en banc.
CARTER, Justice.
This is a declaratory judgment action in probate relating to the administration of the estate of Lou D. Carpenter of Monticello, Iowa. Such actions are authorized by Iowa Code section 633.11 (1991). At issue, is the continuing validity, if any, of an option to buy stock in the Monticello State Bank that was conferred by decedent's will on designated officers of that bank and the profit-sharing trust for the bank's employees. After the making of the will, the decedent's stock that was the subject of the option was acquired by a bank holding company in exchange for stock of the holding company and cash. The decedent was a ward under conservatorship at the time her Monticello State Bank shares were tendered to the holding company. The *498 holding company stock and cash that constituted the consideration for the decedent's disposal of her Monticello State Bank stock has been segregated by order of the probate court so as to permit tracing if necessary to effectuate decedent's testamentary intention. This procedure is authorized by Iowa Code section 633.644.
Because the designated executor under decedent's will has a personal interest in this litigation, the present declaratory judgment action was brought by a temporary executor appointed by the probate court. The action seeks a declaration concerning whether the holding company shares and cash that were exchanged for the bank stock to which the options applied may, by substitution, become the subject of the options. The district court's declaratory judgment answered this question in the affirmative. Some of the residuary beneficiaries have appealed from that judgment. After reviewing the record and considering the arguments presented, we answer that question in the negative and reverse the judgment of the district court.
The decedent, Lou D. Carpenter, was the surviving spouse of Halstead Carpenter, who for many years was the chief executive officer of the Monticello State Bank. Halstead Carpenter died in 1950. Following Halstead's death, James Maurice, who succeeded Halstead as chief executive officer of the bank, looked after the financial affairs of Lou D. Carpenter. He did an admirable job in that regard. Mrs. Carpenter's net worth, which was approximately $200,000 when her husband died in 1950, had increased to approximately $6 million by the time of her death on March 5, 1991. Mr. Maurice also did an excellent job of managing the affairs of the Monticello State Bank, whose assets increased from $14 million to $190 million during the approximately forty years he was its chief executive officer.
Lou D. Carpenter executed a will in 1965. This was replaced by another will executed in 1975. Both wills were drafted by James Maurice. The two wills were very similar in most respects. Under the 1965 will, cash bequests were made to the Congregational Church, John McDonald Hospital, Monticello Municipal Swimming Pool, Jones County Fair Association, and Public Library of Monticello. Five persons, who are nieces and nephews of Mrs. Carpenter and who are collectively referred to in this litigation as "the Densmores," received cash bequests. A cash bequest was made to a housekeeper of Mrs. Carpenter and a bequest in trust was made to the brother of Mrs. Carpenter's deceased husband. The five Densmores were made residuary beneficiaries under the will along with five other persons who were nieces and nephews of Mrs. Carpenter and who are referred to in this litigation as "the Ellises."
Following the residuary clause in the 1965 will, it was provided that all bequests were to be paid as soon as possible and were to be tax free. Provision was then made for liquidation of Mrs. Carpenter's assets. It was provided for bequests to reduce proportionately if the assets were not sufficient to pay them in full. Finally, this clause provided:
It is my wish and desire that the active officers of the Monticello State Bank be authorized to purchase from my estate any portion of the Monticello State Bank stock which I may die seized of, the purchase price of the stock to be determined by disinterested appraisers appointed by the court. All officers wishing to purchase stock shall have equal rights.
In her 1975 will, Mrs. Carpenter eliminated the bequests to her housekeeper, who was at that time deceased, and to her husband's brother, who also was deceased. The cash bequests to the Densmore nieces and nephews were increased, and in addition, these five persons were each bequeathed 160 shares of Monticello State Bank stock and 160 shares of MSB Corporation stock, a corporation that owned a bank in Central City, Iowa. Cash bequests to the same five charities were included in the 1975 will, and the amount of those bequests was increased.
The residuary legatees under the 1975 will were the same as those persons designated in the 1965 will. In the 1975 will, following the residuary clause, provision was made for liquidation of Mrs. Carpenter's assets. In regard thereto, it was stated:

*499 It is my wish and desire and I direct that the balance of my stock in the Monticello State Bank and the MSB Corporation which I die seized of shall first be offered to the following: James A. Maurice, twenty percent (20%), Louis L. Morf, twenty percent (20%), other active officers of the Monticello State Bank, twenty percent (20%), and the Monticello State Bank Profit Sharing Trust, forty percent (40%). The Monticello State Bank stock be sold to the above at two-thirds (2/3) of book value as of December 31st, prior to my death. The book value to be the total of the banks Capital, Surplus, and Undivided Profits divided by the number of outstanding shares of the bank's common stock. The MSB Corporation stock be sold to the above at my original cost per share which is $15.00 as of this date plus accrued interest at nine percent (9%) compounded annually from January 1, 1964 to the date of my death.
At this time, Mrs. Carpenter owned 1362 shares of stock in the Monticello State Bank. Eight hundred of these shares were bequeathed to the Densmores. Consequently, 562 shares were made the subject of these options.
The MSB Corporation stock was among Mrs. Carpenter's assets at the time of her death. There is no issue in this litigation concerning that portion of the clause last quoted affecting the sale of that stock, and the district court correctly found that those options could be exercised. The shares of Monticello State Bank stock owned by Mrs. Carpenter at the time she executed the 1975 will were not in existence at the time of her death. The effect of the option as to those shares is in dispute. In addition, the demise of the Monticello State Bank as a separate entity renders it impossible to compute an option price based on two-thirds of the bank's book value on December 31 prior to Mrs. Carpenter's death.
This is not a true ademption case involving bequeathed property disposed of during a testator's lifetime. It is, rather, a case involving an option granted by will to buy specifically described property owned by the testator at the time the will was executed. Because that property was no longer owned by the testator when she died, a question has arisen concerning whether the option legatees acquired any viable claim against the testator's estate. Because the case was tried by equitable proceedings, our review is de novo. Iowa R.App.P. 4.
This court has previously dealt with the problem of impossibility of literal compliance with an option clause in a will because of events that occurred after execution of the will. In In re Estate of Beaver, 206 N.W.2d 692 (Iowa 1973), the will provided that a beneficiary was to have an option to purchase certain property and that the option was to be exercised before that beneficiary attained thirty years of of age. As events transpired, however, this beneficiary was more than thirty years of age by the time the testator died. We stated that:
In some instances ... impossibility renders a gift void, while in others literal compliance is excused or, more accurately, the clause is held not to be a condition to the gift as events come to pass.
Id. at 695. We concluded on the facts presented in Beaver that the beneficiary should be allowed to exercise the option notwithstanding her inability to do so before she attained thirty years of age. We based this result on our finding that literal compliance with this age requirement was not necessary to carry out the intention of the testator.
In the present case, Lou D. Carpenter did not voluntarily relinquish her stock in the Monticello State Bank. This was done by her conservator under direction of the probate court. The probate court conditioned the conservator's authority to exchange the shares upon a requirement that the shares be segregated in the accounts of the conservatorship so that the proceeds could be traced. That action appears to have been an attempt by that court to preserve the ward's testamentary intent concerning the Monticello State Bank shares bequeathed to the Densmores. It may also have been a precautionary effort to allow the proceeds of the tendered shares that were subject to the option to be traced should that become necessary. The probate court had the power to do this under section 633.644 if that action *500 would serve to preserve testamentary intent. There is no dispute in the present case concerning substitution of the proceeds of the tender for those bank shares bequeathed to the Densmores. There is, however, a dispute as to whether the proceeds of the tender may be substituted for the tendered bank shares in carrying out the option granted bank officers. After fully reflecting on the circumstances surrounding these options, as shown by the evidence, we must conclude that giving them continuing viability would not serve to foster Lou D. Carpenter's testamentary intent.
Those persons who were granted an option to buy Monticello State Bank stock under decedent's will argue that those options were intended to confer a benefit on bank officers and profit sharing employees. From this premise, they argue that the district court acted properly to preserve the testator's intent by segregating and holding intact the consideration received for the shares that were the subject of the option. The final step in that effort, they argue, is to permit those option beneficiaries to acquire this consideration by way of substitution for the Monticello State Bank shares described in the option.
Evidence was presented that Mrs. Carpenter thought highly of Mr. Maurice, Mr. Morf, and officers and employees of the bank in general. She frequently attended bank social functions with those persons. Mr. Maurice, in addition to providing financial advice, looked after Mrs. Carpenter's living concerns and medical needs. The goodwill that this relationship naturally engendered would support a finding that Mrs. Carpenter conferred the stock options on bank officers and the employee benefit trust because she believed that the persons affected would be appreciative of the opportunity to purchase closely held stock in the financial institution by which they were employed. She had the opportunity to grant them that benefit as part of the liquidation of her assets. We believe, however, that the intended benefit to bank officers and profit sharing employees from the viewpoint of Mrs. Carpenter was the opportunity on their part to become more closely linked to the banking organization to which she was affectionately attached, and to which she hoped they were also affectionately attached.
Appellees argue that Mrs. Carpenter was sufficiently sophisticated in business matters to have realized that the shares to which the options related might appreciate in value after the execution of her will. Assuming that this is true, it does not aid their case. If the shares described in the will were still in existence and had appreciated in value, then appellees could argue successfully that they could nonetheless acquire them for the option price. But, because those shares are not in existence, the options must fail unless both the shares sought to be substituted and the price sought to be substituted are consistent with Mrs. Carpenter's purposes in granting the options. The evidence does not suggest that this is true as to either the stock or the price. It appears to have been her purpose to foster esprit de corps at the Monticello State Bank while simultaneously generating a source of cash for the residuary beneficiaries. The first part of this dual purpose cannot be realized by a judicially decreed substitution of shares of the holding company as the subject of the options. That is because the relationship of the bank officers and profit sharing employees to that entity is entirely different. The second part of Mrs. Carpenter's dual purpose is no longer valid as the holding company shares can be freely bought or sold on the NASDAQ Stock Exchange.[1]
Appellees suggest in their argument to this court, although not very forcefully, that it was Mrs. Carpenter's intent to allow those persons given the options to buy the bank stock at a discounted price. We are unable to find any support for this contention in the record. To sustain this claim, it would be absolutely essential to show that the formula price contained in the option clause was calculated to be a price discounted below the *501 stock's market value. There was no showing made that at any time in the bank's history the market price of the stock exceeded two-thirds of book value. Instead, the evidence reveals that this stock was consistently traded at approximately two-thirds of book value.
Mrs. Carpenter's 1965 will provided that the option price for the bank stock was to be fixed at market value by a disinterested appraiser. Between the time that will was prepared and the 1975 will was prepared, Mrs. Carpenter's brother-in-law died owning 400 shares of Monticello State Bank stock. A formal appraisal of those shares was conducted at that time by an investment banking firm appointed by the probate court pursuant to directions in his will. The resulting appraisal fixed the market value of these shares at two-thirds of book value.
It is, of course, impossible to be absolutely certain as to the reasons that prompted Mrs. Carpenter to change the method for calculating the option price from appraisal, as provided in the 1965 will, to two-thirds of book value, as specified in the 1975 will. We find, however, that it is more likely than not that this change was the result of two circumstances. These were (1) a belief that the data revealed in the appraisal conducted in the estate of Mrs. Carpenter's brother-in-law was not likely to change during her lifetime, and (2) the fact that the financial statements prepared annually for Mrs. Carpenter consistently showed the value of the Monticello State Bank stock to be two-thirds of its book value.
The testimony of Mr. Maurice, who was both the preparer of Mrs. Carpenter's will and, as an option holder, an interested party in the litigation, touches on this point. In commenting on the changes from the 1965 will with respect to the options to purchase Monticello State Bank stock, he testified:
Q. Did Mrs. Carpenter orally or in writing state to you any other changes she wanted in her 1975 Will different from her 1965 Will? A. It was orally she was wanting the Densmores to get some stock, open stock, of the Monticello State Bank.
Q. She wanted the five Densmores to each receive 160 shares of Monticello State Bank stock? A. Yes. That's what she finally decided on.
Q. Did she orally or in writing tell you any other changes she wanted? A. Oh, she wantedof course, that came to There was still some more stocks left, and so then she told me about that she would like to see the employees rewarded.
Q. Rewarded in what sense? A. That they could have an option to buy some stock.
Q. Did she request any other changes? A. Not that I can think of right now.
Q. Did she specifically request a change to the appraisal method of the Monticello State Bank stock under the option? A. Well, that was part of the discussions and Ias I've stated before, I don't remember exactly what all the discussion was.
Q. Did you in fact suggest the language "two-thirds of book value as of December 31st closest to her death"? A. I don't know who suggested that. Her statements, you know, that we gave her was always two-thirds. I don't know whether she thought that would be a good figure or not.
....
Q. Did you in fact suggest to Mrs. Carpenter that she put into her 1975 Will the phrase that "The Monticello State Bank stock be sold to the above at two-thirds of book value as of December 31st, prior to my death"? A. I don't know. We talked about a lot of things and that's what we ended up with.
Q. Did you consider the language in the 1975 Will that I just read to you a change in method of valuation from the 1965 Will? A. I don't know.
Q. Mr. Maurice, you had used similar language in the 1975 Will and the 1965 Will. Why didn't you use the same appraisal language in the 1975 Will for bank stock that you used in the 1965 Will? A. Well, we discussed what to use and this is what we came up with.
Q. Did you relate to Mrs. Carpenter that that might result in the sale of bank *502 stock for less than the market value? A. No.
Nothing in Mr. Maurice's testimony or any of the other evidence presented suggests that Mrs. Carpenter would have believed at the time her 1975 will was executed that a price of two-thirds of book value represented a discounted price below market value.[2] Instead it would appear that, if she was aware of the history of this stock, she would have believed that two-thirds of book value was the approximate market value of the shares. It is significant in interpreting this language in the will that it is placed in the clause that follows the residuary clause and deals with liquidation of the assets for purposes of paying cash to residuary beneficiaries. Concerning the general plan of asset disposition, this clause provides: "It is my wish that the conversion of my estate into cash be as favorable as possible." Under the interpretation adopted by the district court, the shares of the holding company that acquired the Monticello State Bank stock and the cash boot that accompanied the exchange of stock would be disposed of by the estate for more than $600,000 below market value. We are convinced that this result represents an unwarranted enlargement of the option bequest beyond the terms of Mrs. Carpenter's will.
Part of this distortion results from the district court's conclusion that the option price be set at two-thirds of the book value of the shares of the holding company that acquired the Monticello State Bank. There appears to be no relationship between the assets and liabilities of the holding company and the assets and liabilities of the Monticello State Bank. If a discounted price for the stock had been intended, a better approach would have been to quantify that discount as a percentage of market value and apply that percentage to the market value of the substituted shares and accompanying cash boot. Based on our view of the evidence, however, that percentage of market value would be 100%. There is no purpose in a judicial reformation of the option simply to allow the appellees to purchase stock from the estate at market value when the same stock can be purchased for market value on the NASDAQ Stock Exchange.
We have considered all arguments presented and conclude that the options to purchase shares of the Monticello State Bank fail for lack of purpose as the result of the estate no longer owning the subject matter to which the options relate. That portion of the district court's judgment upholding those options is reversed. The case is remanded to that court for a decree and order declaring the options to be incapable of enforcement.
REVERSED AND REMANDED.
All Justices concur except SNELL, J., and McGIVERIN, C.J., and LARSON and ANDREASEN, JJ., who dissent.
SNELL, Justice (dissenting).
I respectfully dissent.
The majority has etherealized a result outside the realm of record evidence or legal support. There is no evidence to support the majority's notion that when the Monticello State Bank was sold to the holding company, Iowa National Bankshares Corporation, somehow, the stock options Lou Carpenter intended people to have were devitalized. No legal authority is cited by the majority that this is some kind of ademption or unauthorized transmutation of testator intent. The reason for this void of authority, of course, is that nonexistent legal authority, an oxymoron, cannot be cited.
The majority has abandoned the signal purpose of this judicial inquiryhonoring the wishes of the testator. The majority suggests that Lou Carpenter's purpose in granting these options was not to benefit people financially but to link the employees to the bank where they worked. No evidence is cited for this idea because there is none. The majority has created a bricks and mortar vision, separating the bank as an institution from the people who work for it and who *503 gave it life. The notion is invented that Lou Carpenter's real interest, hence testamentary intent, was to preserve the Monticello State Bank as an institution and give the bank employees a chance to link themselves to it. Why Lou Carpenter would think that bank tellers and other employees loved the bank so much that they would or could buy bank stock at full market price is not explained. The reason this is not explained is because no record evidence exists in support and the idea defies logic. The record is not that Lou Carpenter was "affectionately attached to a banking organization," as the majority says. Lou Carpenter was affectionately attached to the people who were the bank, whom she knew and loved for years, and wanted to benefit financially.
The implication is made by the majority that to give a $600,000 benefit to a large group of bank employees is a bad thing to do, "an unwarranted enlargement" of the option. No reason is given why Lou Carpenter would not want this for lifetime friends of hers. This is not a case of ignoring relatives, or failing to take care of the natural objects of her bounty. She had no children; nieces and nephews were her closest relatives. These relatives were given in excess of $2,500,000 by Lou Carpenter's will. There is nothing illegal, unethical, immoral, unsound, or unwarranted in Lou Carpenter's desire to provide a substantial financial benefit to people in the bank.
Our standard of review in these cases is de novo. A declaratory judgment action brought for the construction or interpretation of a will is equitable in nature and our review is de novo. Iowa Code § 633.33 (1993); Iowa R.App.P. 4; In re Estate of Rogers, 473 N.W.2d 36, 39 (Iowa 1991); In re Estate of Anderson, 359 N.W.2d 479, 480 (Iowa 1984). We give weight to the trial court's findings of fact but they do not bind us. Rogers, 473 N.W.2d at 39.
My review convinces me that the analysis of the applicable law and application to these facts by the able district court in holding these options to be viable and valid was correct. The following shows why.

I. Factual and Procedural Background
Lou Carpenter moved to Monticello, Iowa after she married Halstead Carpenter in the early years of this century. During their marriage, Halstead Carpenter was the cashier and chief executive officer of the Monticello State Bank. The Carpenters had only one child who died in infancy. The couple provided the bank the same level of attention and concern they might have granted a child.
James A. Maurice, a native of Monticello, became acquainted with Halstead Carpenter when Maurice worked for him at the 1933 Jones County Fair. In 1934, Halstead Carpenter offered Maurice a job as a teller at the bank and Maurice held this position until 1942 when he left to serve with the army. When his service with the army ended in 1946, Maurice returned to the bank and Halstead Carpenter promoted him to the position of assistant cashier.
Halstead Carpenter's health began to deteriorate in the late 1940s due to a heart condition. After Maurice returned from serving in the army, Halstead began training him to take over his position. At this time, Halstead also asked Maurice to take care of his wife after his death. Halstead Carpenter died in 1950only four years after Maurice had returned from the army. Upon Halstead's death, Maurice became the CEO and chairman of the board of the bank. In 1952, Louis L. Morf began work at the bank as an assistant cashier. During his employment with the bank, Morf became cashier, vice president, and ultimately, senior vice president.
As a result of Halstead's death, Lou Carpenter inherited an estate worth approximately $200,000 in 1950. Included within this estate were numerous shares of the Monticello State Bank and the MSB Corporation. The MSB Corporation held as its sole asset stock of the City State Bank in Central City, Iowa. Lou Carpenter's inheritance made her the largest single shareholder of the Monticello State Bank.
For the remainder of her life following her husband's death, Lou Carpenter relied on Maurice for assistance in managing her affairs. Maurice voted her bank stock and *504 prepared her financial statements and tax returns. Maurice drafted two wills for Lou, one in 1965 and one in 1975.
At the time of the execution of the 1975 will, Lou Carpenter owned 1362 shares each of the bank and MSB. The will devised 800 shares of each entity to five nieces and nephews in equal shares. Specifically, items II through VI of the will devised 160 shares of the bank and 160 shares of MSB to Catherine Densmore, Lorna Densmore Funk, Fritzi Densmore Vee, Jack Densmore, and Frank Densmore. These provisions also devised $30,000 to Catherine Densmore and $20,000 each to the other Densmore nieces and nephews. Items VII through XI of the will bequeathed $10,000 to Lou Carpenter's nephews Frank, Fred, and Charles Ellis, $10,000 to her niece Irene Ellis Byrne, and $20,000 to her niece Thelma Ellis Reihm.
The will also provided a number of specific bequests to charities. Items XII and XIV through XVI devised $2000 each to the Monticello Congregational Church, the Monticello Municipal Swimming Pool, the Jones County Fair Association, and the Monticello Public Library. Item XIII devised $10,000 to the John McDonald Hospital of Monticello.
Item XVII devised Lou Carpenter's personal effects to the three Densmore nieces. Item XVIII provided that all the residue of the estate was to be divided equally among the ten Densmore and Ellis nieces and nephews. The fourth unnumbered paragraph of item XIX provided that Lou Carpenter's entire interest in the First State Street Improvement Corporation (FSI) be sold to the other stockholders of the corporation for her original investment of $12,500 plus 6% interest compounded annually from January 1, 1967 to her death. Various members of the bank board, including Maurice and Morf, had formed FSI for the purpose of improving the appearance of the street on which the bank was located.
The will directed that Lou Carpenter's remaining 562 bank shares be converted to cash, and that the proceeds be divided equally among her ten nieces and nephews as residuary legatees. Specifically, the fifth unnumbered paragraph of item XIX provided that the following parties were to be granted an option to purchase the balance of Lou Carpenter's bank and MSB stock "which [she] died seized of": James Maurice, 20%; Louis Morf, 20%; "other active officers of the Monticello State Bank," 20%; and the Monticello State Bank Profit Sharing Trust, 40%.
The fifth unnumbered paragraph of item XIX provided that the option purchase price be set at two-thirds of book value as of December 31 prior to Lou Carpenter's date of death. Monticello State Bank stock was not traded on any exchange and was traditionally sold between interested individuals at a price of two-thirds of book value. The bank stock was once professionally appraised at $536 per share when book value was approximately $800 per share, or two-thirds of book value. The option purchase price of MSB shares was to be Lou Carpenter's original cost, or $15 plus 9% interest compounded annually from January 1, 1946 to her date of death. Among other provisions, the will also nominated the Monticello State Bank to be the executor of her estate.
In 1988, Maurice filed a petition in the Jones County District Court seeking the appointment of a conservator for Lou Carpenter on the ground that she had become unable to carry out important decisions concerning her financial affairs. By order dated December 23, 1988, the court appointed the Monticello State Bank as Lou Carpenter's conservator.
In late September 1989, the bank entered into an agreement to merge with the Iowa National Bankshares Corporation, a bank holding company which currently owns stock in five Iowa banks. The parties finalized the merger agreement on or about April 23, 1990. The plan to sell the bank originated with Maurice and was pursued at his urging. He testified that he felt changes needed to be made in the bank because the directors and officers of the bank were getting old.
Pursuant to the merger agreement, each share of Monticello Bank stock was exchanged for $994.10 in cash and 72.71 shares of INB stock. At the time of the merger, the bank had assets of approximately $180,000,000 and approximately 200 shareholders held *505 its 8000 shares. Lou Carpenter's ownership constituted an interest of slightly more than 17% of the issued and outstanding shares of the bank. The merger agreement contained a condition which provided that INB was only obligated under the agreement if the holders of no more than 5% of the bank's shareholders perfected dissenting shareholder's rights.
Lou Carpenter's temporary conservator, Robert R. Beckmann, applied to the district court for authorization to vote Lou Carpenter's shares in favor of the merger. The Monticello State Bank Profit Sharing Trust was the only party that filed a resistance and objection to Beckmann's application. At the time of the application, the trust had approximately forty beneficiaries and $5,000,000 in assets. The merger agreement provided that the trust would be terminated and its assets distributed to the trust beneficiaries. The trust terminated in late 1990.
The district court granted authorization to the temporary conservator to vote Lou Carpenter's shares in favor of the merger. Pursuant to the agreement, Lou Carpenter's shares were converted to cash and INB shares at the agreed rate. The court ordered that the proceeds from the sale of Lou Carpenter's shares be segregated in the accounts of the conservatorship so that the proceeds could be traced.
Lou Carpenter died March 5, 1991, at the age of 100, and her will was admitted to probate in the district court. In October of 1991, the Monticello State Bank, acting as Carpenter's executor, filed an application with the district court seeking authorization to distribute shares of INB to partially satisfy Carpenter's bequests of bank stock to the Densmores. The court held that the specific bequests of the bank stock to the Densmores had not adeemed as a result of the bank's merger with INB. Authorization was granted to the bank to distribute to the Densmores those shares of INB which were traceable to the bank shares the Densmores would have received if the merger had not occurred. The court also authorized the bank to retain the cash which was additionally exchanged for the bank shares in the merger and which could be traced to the shares the Densmores were entitled to, until the estate's tax obligation was finally determined.
The temporary executor of Carpenter's estate, Robert R. Beckmann, subsequently brought an application for declaratory judgment in the district court seeking construction of that portion of Carpenter's will which grants options to different parties to purchase Monticello State Bank and MSB stock. Defendants in this action included the Densmores, the Ellises, and numerous individuals claiming a beneficial interest due to their potential positions as "other active officers of the Monticello State Bank" or as beneficiaries of the Monticello State Bank Profit Sharing Trust.
After a trial, the court held that item XIX of Lou Carpenter's will granted a valid option to purchase bank and MSB stock, and that the temporary executor was required to offer INB shares and cash to Maurice, Morf, and those individuals constituting "other active officers" and beneficiaries of the trust. With regard to the option purchase price to be offered these parties, the court noted that each share of Monticello State Bank stock was converted to 72.71 shares of INB stock and $994.10 in cash. The court then noted that the will provided that the bank stock was to be offered to the parties at two-thirds of its book value. The court therefore applied the two-thirds book value formula to the INB shares and cash that could be traced to the bank shares for which they were exchanged. The market price of INB stock on December 31, 1990, quoted on the NASDAQ exchange, was $33.00. The book value of INB stock on the same date was $31.45. The court determined that two-thirds of the book value of INB shares on December 31, 1990 was $20.96 and two-thirds of $994.10 was $662.73. Multiplying $20.96 by 72.71 and adding $662.73, the court held that the proper purchase price for the INB shares and cash traceable to each Monticello Bank share was $2,186.73. The court also held that the optionees could exercise their option to purchase MSB Corporation stock at $15 per share plus interest as provided in the will.
The court held that since a will is ambulatory and speaks only as of the date of death, "other active officers of the Monticello State *506 Bank" were those persons "employed in an executive capacity at the time of testator's death" despite the changes caused by the merger. The court also held that even though the profit sharing trust "effectively `died'" when the merger was effected, Carpenter's granting of an option to purchase bank stock to the trust was merely a way of benefiting the employees of the bank, and not the trust for its own sake. The court therefore held that despite the termination of the trust, those individuals who would have been beneficiaries under the trust are entitled to options to purchase INB shares and cash under the will.

II. Ademption of Purchase Option
The first issue presented on appeal may be summarized as follows: whether an option to buy stock granted in a testator's will adeems when the stock is exchanged for the stock of another corporation pursuant to a merger, where the exchange occurs: (1) after the testator has become incompetent; and (2) under the scrutiny of a conservator pursuant to court order. The factors which make this a novel and complex issue are that this is: (1) a bequest of an option to purchase stock rather than a bequest of stock; (2) an exchange rather than a sale of the subject matter of the bequest; and (3) the actions of a conservator rather than the testator.
The Densmores raise two general arguments against the continued existence of the options. First, they argue that the doctrine of ademption does not apply in this instance because ademption only applies to specific bequests and testamentary options cannot be specific bequests because they do not constitute property but merely a nonbinding right. Therefore, they argue, because the property was disposed of before the death of the testator, the option created no enforceable rights in the optionees, and the option was effectively revoked.
Second, the Densmores assert that if the doctrine of ademption does apply, the fact that a conservator exchanged the subject matter of the option while the testator was incompetent does not save the bequest because the proceeds of the disposal of the subject matter are not traceable. The Densmores contend that the proceeds are not traceable because the stock and cash exchanged for the bank stock are materially different from the bank stock. The optionees respond by arguing that the principles of ademption do apply and the options did not adeem as a result of the transfer because: (1) the transfer occurred while the testator was incompetent, and therefore she could not have formed the intent to dispose of the subject matter of the options; and (2) the proceeds of the disposal of the subject matter of the options are traceable since the INB stock and proceeds from the exchange were kept segregated following the merger, and the INB stock does not represent a material change in interest from the bank stock.
Well-settled precepts govern our interpretation of wills. First, the intent of the testator is the central principle guiding our interpretation and must prevail. Rogers, 473 N.W.2d at 39; Anderson, 359 N.W.2d at 480. Second, we must derive the testator's intent from a consideration of: (1) all of the language contained within the will; (2) the testator's scheme of distribution; (3) the circumstances which surrounded the will's execution; and (4) the existing facts. Rogers, 473 N.W.2d at 39. Third, we will use technical rules or canons of construction only when the will is ambiguous or conflicting or if the testator's intent is uncertain. Id. In determining intent, the question we seek to answer is not what the testator meant to say, but rather what the meaning is of what the testator did say. Id. In attempting to determine a testator's intent we consider the instrument as a whole and give each part meaning and effect, if possible. Id.
Ademption generally occurs when a testator, following the execution of a will but before the testator's death, disposes of property which the testator has specifically given under the will. In re Estate of Wolfe, 208 N.W.2d 923 (Iowa 1973). The Densmores argue that the doctrine of ademption does not apply to the controversy at hand because an option granted within a will does not confer a property right upon the optionees.
The mere execution of a will does not confer any property rights to anyone named *507 in the will. In re Lundgren's Estate, 250 Iowa 1233, 1237, 98 N.W.2d 839, 841 (1959). A will is merely ambulatory. Id. By its execution, the maker does not part with any rights or divest herself of any part of her estate, nor do any rights "accrue to, or vest in, any other person." Id.
For purposes of the doctrine of ademption, the real question is not whether a bequest creates a property interest in the beneficiary, but rather whether the subject of the bequest constitutes a specific property interest of the testator. A specific bequest or legacy is:
a designated article or specific part of the testator's estate which is identified and distinguishable from other things of the same kind, which may be satisfied by delivery of the specific thing or portion. It may be looked upon as one which the testator has separated from the general mass of his property for the benefit of a particular legatee; and in ascertaining whether a legacy is specific, recourse should be had to the intention of the testator.
Zion Lutheran Church v. Executors of Estate of Lamp, 260 Iowa 363, 366, 149 N.W.2d 137, 139 (1967); see also In re Estate of Hoagland, 203 N.W.2d 577, 581 (Iowa 1973); In re Estate of Deutsch, 644 P.2d 768, 770 (Wyo.1982). Because the option Lou Carpenter granted in her will for the purchase of the bank stock arose as an incident of her property right to own and dispose of the stock, her grant of the options amounted to a specific bequest of a property interest.
The Densmores assert that In re Estate of Lemke, 216 N.W.2d 186 (Iowa 1974), stands for the proposition that options are different from specific bequests, and this difference suggests ademption analysis cannot be applied to options granted in wills. Lemke held that a testator's intent controls will interpretation and the language of the will indicated that the testator did not intend a purchase option in real estate to be inheritable. Lemke, 216 N.W.2d at 190-92. Lemke did not hold that an option may not constitute the subject matter of a specific bequest and does not render ademption analysis inapplicable. Of greatest significance, in Lemke, this court did state that the purchase option at issue "constituted a valuable property right" but that this factor was not per se determinative and the real controlling factor is the testator's intent. Id.
Applying ademption analysis, under Iowa law, where the conservator of an incompetent testator sells specifically devised property with court approval, the devise is only adeemed to the extent the conservator uses proceeds of the sale for care and maintenance of the ward and expenses of the conservatorship. Stake v. Cole, 257 Iowa 594, 599, 133 N.W.2d 714, 717 (1965). Proceeds which are traceable from the sale into the hands of the executor do not adeem. Id. This is the majority rule among American jurisdictions and is based on the rationale that the testator's intent controls disposition of the testator's property and an incompetent testator "cannot form the intent to adeem the property or avoid the effect of an unwanted ademption with a new will." Id.; In re Estate of Swoyer, 439 N.W.2d 823, 825-26 (S.D. 1989). Applying this exception to ademption, the exchange of bank stock for INB stock and cash did not cause the options to adeem.
Next is the question whether the proceeds of the exchange are "traceable." Generally, where there has been a specific bequest of securities or a specific bequest of options to purchase securities, a change in the form or description of the securities which does not materially change the true interest of the testator in the corporation will not cause an ademption and the beneficiary or optionee is entitled to the new securities or options to purchase the new securities. Matthews v. Matthews, 477 So.2d 391, 394 (Ala.1985) (stock bequest); In re Vail's Estate, 67 So.2d 665, 667 (Fla.1953) (stock bequest); Goode v. Reynolds, 208 Ky. 441, 271 S.W. 600, 602-03 (1925) (stock bequest); Opperman v. Anderson, 782 S.W.2d 8, 11 (Tex.App.1989) (stock bequest); In re Armour's Estate, 11 N.J. 257, 94 A.2d 286, 292 (1952) (option bequest); In re Will of Strauss, 137 Misc.2d 686, 521 N.Y.S.2d 642, 644-45 (Sur.Ct.1987) (stock bequest); In re Kent's Will, 20 Misc.2d 923, 189 N.Y.S.2d 676, 685-86 (Sur. *508 Ct.1959) (option bequest); 80 Am.Jur.2d Wills § 1716, at 772 (1975).
Where stock is the subject of a specific bequest or a specifically bequested option is exchanged in a merger, consolidation, or divestiture for other securities, one factor for consideration is whether the new securities represent a change in form or substance. Goode, 271 S.W. at 602-03; Armour, 94 A.2d at 292; 80 Am.Jur.2d Wills § 1716, at 772. However, the controlling factor is the intent of the testator. duPont v. duPont, 42 Del. Ch. 246, 208 A.2d 509, 511 (1965); Opperman, 782 S.W.2d at 10; 80 Am.Jur.2d Wills § 1716, at 773. Some courts hold that where a bequest of bank stock clearly indicates that the intent of the testator was to grant all rights and benefits flowing from the stock in the beneficiary, no change in the shares, whether of form or substance, will cause the bequest to adeem, so long as the proceeds are traceable. See, e.g., In re Estate of Watkins, 284 So.2d 679, 681 (Fla.1973).
In the case at hand, the change in securities which resulted from the merger, when considered in coordination with the evident intent of the testator, was not so substantial as to cause an ademption of the options. Although the Monticello State Bank stock was exchanged for the stock of INB, a bank holding company with ownership interests in five banks, the bank itself retained its former name, location, customer base, assets and liabilities, and many of the same employees. When considering these differences and the many remaining similarities, we must also consider Lou Carpenter's intent.
In order to determine intent, we may not look to extrinsic evidence to vary, contradict, or add to the terms of the will, but we may use extrinsic evidence as an aid in resolving doubts where the instrument is ambiguous. Rogers, 473 N.W.2d at 39. Ambiguity may be patent or latent. Id. A will is patently ambiguous if its meaning is uncertain, doubtful, or obscure on its face. Id. A will is latently ambiguous if it is clear on its face, but "some outside matter renders the meaning obscure or uncertain." Id. at 40.
The exchange of bank shares for INB shares is an outside matter which has rendered the options ambiguous. We therefore consider all available evidence in attempting to determine Lou Carpenter's intention as manifested in her grant of options. The record contains considerable evidence which shows that Lou Carpenter was proud of the bank and its employees. In addition, the will and circumstances surrounding the will support a finding that it was Carpenter's intent to reward bank employees for their service to the bank and for their friendship. In the years before her health failed, Carpenter visited the bank often and took part in social gatherings with bank employees and their families.
The record shows that it was Lou Carpenter's intention to provide the bank employees with an option to benefit from the rights and benefits flowing from ownership of the bank stock. The rights and benefits flowing from ownership of the bank stock included the right to securities and cash acquired as a result of exchange of the bank's stock. Therefore, the options did not adeem, and the bank employees have the option to purchase the INB shares and proceeds traceable to the bank stock. Those shares and proceeds are easily traceable since the district court ordered the conservator to keep them segregated.

III. Purchase Option Price
The Densmores argue that the application of the "two-thirds book value" formula to the INB stock in arriving at a purchase option price for the INB stock is contrary to Lou Carpenter's intent. They assert that Carpenter set the option purchase price for the Monticello State Bank stock at two-thirds of book value because this is equivalent to the market value of the bank stock and Carpenter's intent was merely to provide a market in the stock. The Densmores assert that application of the "two-thirds book value" formula to the INB stock and cash received in exchange for the bank stock would confer an economic benefit on the optionees that Carpenter could not have foreseen nor intended and would effectively rob the residuary beneficiaries of a considerable sum of money. The optionees argue that Lou Carpenter was sophisticated in financial matters, could have foreseen the change in the market *509 value of the bank stock, and did intend to confer an economic benefit on the optionees due to her appreciation for their support of her and dedication to the bank.
Carpenter's intent guides our resolution of this question. Rogers, 473 N.W.2d at 39; Anderson, 359 N.W.2d at 480. The fifth paragraph of item XIX of Lou Carpenter's will is latently ambiguous. On its face, it provides a formula for the calculation of an option purchase price for Monticello State Bank stock. However, the outside fact of the occurrence of the merger renders the formula ambiguous with regard to the proper formula for the calculation of an option purchase price for the securities and cash which have replaced the stock of the bank. Cf. Strauss, 521 N.Y.S.2d at 644 (divestiture of AT & T rendered bequests of AT & T stock latently ambiguous). We may therefore look to extrinsic evidence as an aid in determining Carpenter's intent. Rogers, 473 N.W.2d at 39.
In the fifth unnumbered paragraph of item XIX, Carpenter provided that the optionees have the right to purchase her remaining shares of the Monticello State Bank stock at two-thirds of the shares' book value as of December 31 prior to her death. The trial court applied this formula to the INB shares and cash exchanged in place of the bank shares in arriving at its determined option purchase price.
The optionees argue that Carpenter could have foreseen an increase in the market value of the Monticello State Bank and that she intended to confer an economic benefit on the bank employees due to their dedication to the bank and their service to her needs. The optionees also assert that Carpenter was financially sophisticated and understood the difference between book value and market value.
Although the record is sparse of direct evidence of Lou Carpenter's intent in the event of an unanticipated bank merger, it does provide adequate indications of her general intent. She was well aware of the pattern of sales of bank stock priced at two-thirds of book value. On its face, the phrase "two-thirds of book value" connotes a valuation at less than the stock's true worth. Without knowing anything more, the phrase indicates a discounted price. To construe the phrase "two-thirds of book value" to mean "market value" would mean that the bank was carrying on its books a book value of one-third more than the stock was worth. There is nothing in the record to suggest that the bank's books would so reflect. Moreover, this inversion of meaning from normal understanding would pervert the words to fit a pricing structure created by the trading of insiders.
The evidence shows that when a small group of shares of bank stock is sold, the sale price is at a substantial discount because the buyer does not gain a control position in the financial institution. James Maurice testified that he did not necessarily believe that two-thirds of book value was the market value of the stock. He testified that he discussed the two-thirds book value option with Lou Carpenter, that she understood the concept of book value, and he was pretty sure that she understood that book value is different from market value. The inventory of Lou Carpenter's conservatorship of the Monticello State Bank stock is shown as "market value unknown. Value shown is two-thirds book value," a further indication that the terms were never considered to be synonymous.
Item XIX of Lou Carpenter's will allows the optionees to buy Monticello Bank stock at two-thirds of book value as of December 31 prior to her death. James Maurice testified that the December 31 date was selected because the bank would definitely have a computation of its book value as of that date. Item XIX further defined "book value" to be "the total of the bank's capital, surplus, and undivided profits divided by the number of outstanding shares of the bank's common stock." No mention of the term "market value" is made in the will, which could have been done by Lou Carpenter, had she intended her bequests to be keyed to a market value concept.
The record is abundantly clear that Lou Carpenter intended by her testamentary provisions to benefit her friends and bank employees. After providing for her relatives by her will there were still some stocks left, so *510 she told James Maurice that she wanted to see the employees rewarded by giving them an option to buy stock. Maurice stated that Lou Carpenter wanted to favor long term employees, many of whom started work at the bank and then retired from the bank after many years of service. Allowing them to buy stock at two-thirds of book value, a discounted price, would assure them of a benefit, whereas if they had to pay market value, any benefit would be less certain and possibly illusory.
Given these considerations, I believe that Lou Carpenter's intent is carried out by construing her use of the phrase "two-thirds of book value" to mean a price not fixed by market value, but reflected by calculating two-thirds of the book value as fixed by the bank on its own books. The trial court found that pursuant to the stock conversion of 1989 each share of Monticello State Bank stock is worth 72.71 shares of Iowa National Bank Shares of Waterloo stock plus $994.10. The court calculated that two-thirds of the book value of each Iowa National Bankshares share on December 31, 1990 was $20.96 and two-thirds of $994.10 was $662.73. Therefore, the selling price for each share of option stock is 72.71 multiplied by $20.96 ($1524) plus $662.73 for a value of $2,186.73. I agree with the trial court's calculations of these option prices.
The respective percentages delineated by the fifth paragraph of item XIX grant James Maurice, Louis Morf, and those individuals constituting "other active officers of the Monticello State Bank" the right to respectively purchase INB shares and cash traceable to 112.4 shares of bank stock and grant the former beneficiaries of the Monticello State Bank Profit Sharing Trust the option to purchase the INB shares and cash traceable to 224.8 bank shares.

IV. Continued Viability of Trust Option
In the fifth paragraph of item XIX of her will, Carpenter granted an option for the purchase of forty percent of the balance of her bank shares to the Monticello State Bank Profit Sharing Trust. The trust provided a means for bank employees to benefit from the bank's profits and apparently provided retirement benefits to beneficiaries. Pursuant to the merger, the trust terminated in late 1990 and its assets were distributed to the beneficiaries.
The Densmores argue that Carpenter granted the option in favor of the trust and not the trust's beneficiaries, and therefore, the option no longer may be effectuated due to the termination of the trust. The Densmores further contend that antilapse principles do not apply to devises to artificial entities which have terminated and therefore, the beneficiaries of the trust may not acquire the option as the heirs of the trust. The optionees assert that the real issue is Carpenter's intent, and since the will and circumstances surrounding its execution demonstrate it was Carpenter's intent to benefit the employees of the bank, the trial court properly applied the doctrine of gift by implication in finding that the beneficiaries are entitled to exercise the option.
To answer this issue, we do not need to look to the principles associated with revival of trusts or the implications associated with the termination of a trust. Although it would have been a better procedure for the responsible parties to provide for the continuation of the trust for the purpose of taking under Carpenter's will, the testator's intent controls the outcome of this matter.
Iowa recognizes the doctrine of gift by implication. On many occasions, we have cited with approval the following explanation of the doctrine:
When a testator's will clearly reveals a general plan or intention as to the disposition of his property, and a situation arises that is not within the express language of the will, such general plan may be regarded as existing but incompletely expressed, and the failure to provide for the situation inadvertent rather than intentional, and a gift may be implied for the purpose of completing the general plan.
Conn v. Williams, 353 N.W.2d 411, 415 (Iowa 1984); Russell v. Johnston, 327 N.W.2d 226, 230 (Iowa 1982); Porter v. Porter, 286 N.W.2d 649, 654 (Iowa 1979) (quoting Davis v. Davis, 24 Ohio Misc. 17, 258 N.E.2d 277, 282 (Com.Pl.1970)); see also In re Estate of *511 Wagner, 507 N.W.2d 711, 714 (Iowa App. 1993). The doctrine is applicable where the probability of the implication is strong. Russell, 327 N.W.2d at 230.
Lou Carpenter's will sets forth a complete scheme of distribution which demonstrates that it was her intent to benefit the employees of the bank by granting them options to enjoy the rights and benefits associated with ownership of the bank stock. To provide that the option granted to the trust terminated due to the termination of the trust would be contrary to her clear intention to benefit the bank employees who have faithfully served the bank for many years. The will did not provide for the contingency of the termination of the trust, but the implication is strong that Carpenter sought to benefit the bank's employees rather than specifically the trust. I would affirm the trial court's holding that those individuals who constituted beneficiaries of the trust on the date of its termination hold the right to options to purchase that amount of stock equivalent to their pro rata interest in the trust on the date of its termination. Specifically, the former beneficiaries would be entitled to purchase pro rata the amount of INB shares and cash equivalent to 224.8 shares of Monticello State Bank at the above stated price.

V. Validity of Maurice's Options
James Maurice personally wrote Lou Carpenter's will pursuant to her instructions. The Densmores assert that it would be contrary to public policy to allow him to benefit from the unanticipated event of the merger since he was the scrivener of the will. The optionees argue that allowing Maurice the right to benefit from the options would not be contrary to public policy because the evidence does not indicate that he in any way wrongly influenced Carpenter, he was her personal friend and advisor, and the language of the will and surrounding circumstances indicate she intended to benefit him for his service to the bank.
When a party standing in a fiduciary relation operates as the scrivener of a will and is made a beneficiary under the will, a suspicion, but not a presumption, of undue influence arises. In re Dankbar, 430 N.W.2d 124, 128 (Iowa 1988). Under Iowa law, under such circumstances, a party challenging will provisions on the ground of undue influence carries the burden of proving the improper influence. Id. In such a case, we view the evidence in the light most favorable to the contesting party. Id.
The Densmores have conceded that no evidence of undue influence exists in the record. They have therefore failed to carry their burden of proving undue influence. Where the record supports no inference of undue influence but rather clearly demonstrates an intent on the part of the testator to benefit the scrivener/beneficiary, it is not against public policy to allow the scrivener/beneficiary to benefit.
For the reasons enunciated above, I would affirm the trial court on all of these issues.
McGIVERIN, C.J., joins this dissent.
NOTES
[1] With an average of $2,705,672 shares outstanding during 1990, total NASDAQ stock market volume for shares of this holding company was 144,558 shares. The average daily volume was 571 shares. Volume in the two months following the December 31, 1990 valuation date was 21,584 shares in January and 10,132 shares in February.
[2] Mr. Maurice's testimony that one reason Mrs. Carpenter changed her will was to reward bank employees is not necessarily inconsistent with our conclusions as to her intent. The changes made in the option clause when the 1975 will was drafted did provide that a broader group of bank employees would receive the intended benefits of these options than was the case under the 1965 will.